2017 PA Super 397

| ELLIOT MENKOWITZ, M.D., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| PEERLESS PUBLICATIONS, INC. AND ERIC ENGQUIST, | No. 2048 EDA 2014 |

Appeal from the Judgment Entered July 23, 2014
In the Court of Common Pleas of Montgomery County
Civil Division at No: 98-07291

| ELLIOT MENKOWITZ, M.D., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| PEERLESS PUBLICATIONS, INC. AND ERIC ENGQUIST, | |
| Appellants | No. 2096 EDA 2014 |

Appeal from the Judgment Entered July 23, 2014
In the Court of Common Pleas of Montgomery County
Civil Division at No: 98-07291

BEFORE: BENDER, P.J.E., BOWES, PANELLA, LAZARUS, OTT, STABILE, DUBOW, MOULTON, RANSOM, JJ.

OPINION BY STABILE, J.: **FILED DECEMBER 15, 2017**

This is an action for defamation commenced by a private-figure plaintiff against a media defendant involving an issue of public interest. Elliot

Menkowitz, M.D., appeals from the July 23, 2014 judgment entered in his favor and against Peerless Publications, Inc. and Eric Engquist (collectively the "Newspaper"), and challenges the trial court's grant of judgment *non obstante verdict* (judgment n.o.v.) on a punitive damage award rendered by a jury.[1] The Newspaper cross-appeals contesting the trial court's denial of judgment n.o.v. or a new trial on the jury award of compensatory damages on the defamation claim. After careful review, we vacate the judgment in favor of Dr. Menkowitz in its entirety and remand for entry of judgment in favor of Peerless Publications, Inc. and Eric Engquist.

The facts giving rise to the within action are as follows. Dr. Menkowitz is a board-certified orthopedic surgeon. In 1971, he was granted staff privileges at the Pottstown Memorial Medical Center ("PMMC"). In April 1996, Mr. John Buckley, the President and CEO of PMMC, told Dr. Menkowitz that his behavior of yelling at staff and other doctors was unacceptable. Mr. Buckley conveyed the Medical Executive Committee's ("MEC") decision "to suspend [Dr. Menkowitz's] privileges or allow him to take a voluntary leave in an attempt to address his behavioral concerns which had been ongoing for some time." N.T. Jury Trial Vol. II, 3/17/14, at 115, **see** Ex. P-3; N.T. Jury Trial

---

[1] Both parties purported to appeal from the June 26, 2014 order disposing of the Newspaper's motion for post-trial relief. We have amended the caption to reflect that the appeals properly lie from the entry of judgment. **Lynn v. Pleasant Valley Country Club**, 54 A.3d 915, 918 (Pa. Super. 2012) (citation omitted) (appeal properly lies from entry of judgment).

Vol. III, 3/18/14, at 609, *see* Ex. P-3. At that time, Dr. Menkowitz informed Mr. Buckley that he had been diagnosed with attention deficit disorder ("ADD") in 1995, he was under the care of a psychiatrist and psychologist, and that Ritalin had been prescribed for the condition. Consequently, in lieu of suspension, the MEC imposed certain conditions described in a May 9, 1996 letter to Dr. Menkowitz:

> This is to inform you that [PMMC] will not tolerate conduct by you which violates the Bylaws and Policies ("Bylaws") of [PMMC]. Specifically, this includes, but is not limited to, the following conduct: verbal harassment of other physicians or employees of [PMMC]; use of unprofessional language to other physicians or employees of [PMMC]; inappropriate behavior in the presence of [PMMC] patients; or physical intimidation of [PMMC] employees.

N.T. Jury Trial Vol. III, 3/18/14, at 609, *see* Ex. P-4. The letter continued that, after Dr. Menkowitz's meeting with Mr. Buckley and others, his disclosure of previously unknown circumstances, and "his agreement to refrain from providing services to patients in [PMMC] through and including May 8, 1996, it was determined that no suspension of your clinical privileges would take place at that time." *Id*. The letter concluded:

> Nevertheless, you should know that any future failure by you to abide by the above restrictions, or any similar related violation by you of the Bylaws of [PMMC] will be considered a willful disregard of the Bylaws of [PMMC] and will result in the summary suspension of your full clinical privileges.

*Id.*

Less than one year later, on March 18, 1997, Dr. Menkowitz's privileges were suspended by PMMC for six months. The suspension was confirmed in a formal letter dated March 25, 1997:

> Since the issuance of the Caution letter, [PMMC] Administration has informed you of your continuing unacceptable conduct . . . This disruptive and unacceptable conduct has been and continues to be a grave concern to [PMMC] and staff because a significant portion of it occurs in operating room suites, patient floors and the transitional care unit.
>
> Consequently, on March 18, 1997, after hearing reports of your conduct, the MEC voted unanimously to reaffirm its decision of April 26, 1996 to implement section 6.5(b) of the Bylaws and summarily suspend your medical staff privileges on the basis that your conduct described in the Caution letter continues and therefore constitutes a willful disregard of the Bylaws or other policies of [PMMC] and also constitutes conduct which affects or could affect, adversely the health or welfare of a patient(s). On March 24, 1997, during a meeting at which [PMMC] staff members appeared and described instances of disruptive behavior by you in the operating room suites and transitional care unit, the Board of Directors reached the conclusion that your conduct poses an immediate threat to the health and welfare of patients. Accordingly, the Board of Directors voted at the March 24, 1997, meeting to unanimously approve the MEC's decision to summarily suspend your medical staff privileges. This summary suspension shall be for a period of six (6) months commencing midnight, March 25, 1997 ("Suspension Period").

N.T. Jury Trial Vol. II., 3/17/14, at 130, *see* Ex. P.-16; N.T. Jury Trial Vol. III, 3/18/14, at 609, *see* Ex. P-16.

On April 18, 1997, the first of four articles written by Eric Engquist, at the time a reporter at the Pottstown Mercury Newspaper, about Dr. Menkowitz's suspension appeared in the Pottstown Mercury Newspaper:

> A prominent physician has been suspended by Pottstown Memorial Medical Center after 25 years on the hospital staff.

- 4 -

Orthopedic surgeon Dr. Elliot Menkowitz, a partner at Orthopedic Specialists of Pottstown, 1603 High St., was banned in late March from seeing patients at the hospital.

The reported six-month suspension was handed down after a "peer review" of Dr. Menkowitz by the hospital's medical executive committee and its board of directors.

Dr. Menkowitz's sudden absence from the hospital has spawned rampant rumors of professional misconduct regarding his treatment of an older female patient. Yet hospital spokesperson Debra L. Bennis has declined numerous requests from The Mercury for comment.

"It's an internal peer review issue, and we're not at liberty to discuss the details," said Bennis. Asked to define the peer review process, she would only say it concerned medical staff privileges.

Dr. Menkowitz has retained prominent Philadelphia attorney, Alan Epstein, but as of Thursday had not legally challenged his suspension. Epstein declined to comment Thursday . . .

. . . .

Colleagues of the doctor lamented his recent fate and said they have never hesitated to refer patients to him.

"I just feel bad," said Dr. Michael Pawlowski. "I know him to be a nice person. I have sent him patients before and he has taken care of them suitably."

"I use him for orthopedic cases," said Dr. Keith Harrison. "In fact, my son fractured his foot and Dr. Menkowitz took care of him."

The two physicians, both former members of the hospital's medical executive committee, said they were unaware of the reason for Dr. Menkowitz's suspension. "You hear rumors, but I'm not aware of any details," said Dr. Pawlowski. I know what you know: that he's not there to take patients."

Complaint, 4/14/98 at ¶ 10 (quoting The Pottstown Mercury Article, April 18, 1997).

The article listed Dr. Menkowitz's professional credentials, civic involvement and contributions, and concluded:

> Three unrelated lawsuits, including two for wrongful death, have been filed against Dr. Menkowitz in Montgomery County in the last five years. The outcome of those suits could not be determined Thursday.
>
> No formal action against Dr. Menkowitz's medical license has been taken by the state Board of Medicine, according to State Department spokesman Kevin Shivers.

*Id.* (quoting The Pottstown Mercury Article, April 18, 1997).

The Newspaper published a second article the next day, April 19, 1997, which reported the details of a civil rights suit filed by Dr. Menkowitz that day against PMMC. The suit alleged that his suspension violated the Americans With Disabilities Act of 1990, 42 U.S.C. §12101 *et seq*. and other federal and state statutes. The Newspaper summarized Dr. Menkowitz's assertions that he had ADD, that PMMC was so informed, that he was being treated for that condition, and that he did not pose a threat to patients or hospital employees. Complaint, 4/14/98 at ¶ 12. The Newspaper reported the physician's allegation that PMMC "engaged in a pattern of harassment and intimidation due to his disability, including suspending his medical privileges without good cause and a fair hearing[,]" and his contention that his suspension had nothing

to do with his treatment of patients. N.T. Jury Trial Vol. III, 3/18/14, at 430, 609, *see* Ex. P-19.The Pottstown Mercury Article, April 19, 1997.

In a follow-up news article on April 23, 1997, the Newspaper reported that an accord had been reached between Dr. Menkowitz and PMMC, and that Dr. Menkowitz's suspension had been lifted. Although the terms were confidential, Dr. Menkowitz's attorney was quoted as saying, "Treatment of the patients by Dr. Menkowitz was never an issue." N.T. Jury Trial Vol. IV, 3/19/14, at 99.

On April 26, 1997, the Newspaper published the following in its editorial column entitled "Cheers and Jeers," which purported to "[c]heer those working to make our community a better place in which to live," and "[j]eer those whose deeds merit derision." The Pottstown Mercury, April 26, 1997.

> JEERS: To Dr. Elliott Menkowitz and Pottstown Memorial Medical Center for the way they settled an incident that got the doctor suspended. PMMC suspended Menkowitz, but then the doctor sued in federal court for damages and to get the suspension lifted. PMMC then backed down and lifted the suspension . . . .

Complaint, 4/14/98 at ¶ 14.

Dr. Menkowitz filed the instant defamation lawsuit against the Newspaper on April 14, 1998.[2] He alleged that the statement "professional

---

[2] Dr. Menkowitz also asserted claims for invasion of privacy based on false light, intentional interference with existing and prospective relationships, and intentional infliction of emotional distress based on the newspaper articles.

misconduct in his treatment of an older, female patient" contained in the April 18, 1997 news article, as well as the April 26, 1997 editorial, were defamatory *per se* and false and made with reckless disregard for the truth.[3] Dr. Menkowitz asserted that the statement "professional misconduct in his treatment of an older, female patient" portrayed him "as an incompetent doctor who engaged in criminal acts toward his patients," *Id*. at ¶17, and "implied that Dr. Menkowitz had engaged in unlawful or unprofessional behavior." *Id*. at ¶ 19.

Dr. Menkowitz testified at trial that he fell into a deep depression after reading the first article. N.T. Jury Trial, Vol. II, 3/17/14, at 254. The depression medications he was prescribed caused fasciculations[4] and tremors in his arms and hands and prevented him from performing surgery. He offered expert testimony that his psychological condition impaired his ability to perform surgery.

The Newspaper took the position that the aforementioned statement was true, not misleading, and published in good faith, with a proper motive, and without malice. Further, in new matter, the Newspaper pled that Dr. Menkowitz's injury to reputation and emotional and psychological injuries

---

[3] Dr. Menkowitz did not challenge the statements in the April 19 and 23, 1997 articles as defamatory or false.

[4] Fasciculations are involuntary muscle twitches.

purportedly caused by the defamatory publication were the same damages that Dr. Menkowitz claimed, in the federal litigation against PMMC, were caused by his wrongful suspension.

For various reasons not pertinent hereto, this case did not proceed to a jury trial until March 2014, almost sixteen years after the filing of the complaint. At the close of Dr. Menkowtiz's case, the trial court denied the Newspaper's motion for nonsuit, which was premised on the absence of proof of falsity. A motion for directed verdict at the close of the evidence also was denied. The jury found in favor of Dr. Menkowitz on the defamation claim and awarded both compensatory and punitive damages.[5]

The Newspaper filed post-trial motions seeking judgment n.o.v. or, in the alternative, a new trial or a remittitur of both the compensatory and punitive damages. Following argument, the trial court vacated the punitive damage award based on its finding that there was no evidence of malice, but upheld the verdict and the award of compensatory damages. Dr. Menkowitz appealed and he presents one issue for our review:

1. Where the jury's verdict on punitive damages was supported by clear and convincing evidence that [the Newspaper] acted with actual malice in publishing defamatory statements about [Dr. Menkowitz] in reckless disregard of the falsity of the defamatory statements published by them, and the [trial] court

---

[5] The jury did not find liability for invasion of privacy based on false light, intentional interference with existing and prospective relationships, and intentional infliction of emotional distress and these claims are not at issue on appeal. The jury also did not award any damages for emotional distress.

below, in granting judgment notwithstanding the verdict, viewed the evidence only in a light favoring to [the Newspaper], did the [trial] court below commit reversible error in vacating the jury's award of punitive damages?

Dr. Menkowitz's Brief at 7.

The Newspaper cross-appealed and asserted six errors: [6]

1. Whether the trial court erred in failing to enter judgment in [the Newspaper's] favor because [Dr. Menkowitz] failed to meet his constitutional burden of proving [the Newspaper's] news report on a matter of public concern contained a material falsehood[?]

2. Whether the trial court committed reversible error by failing to instruct the jury that [Dr. Menkowitz] was obligated to prove the challenged news report was materially false, and [the Newspaper] could not be found liable if the report was substantially true[?]

3. Whether the trial court committed reversible error by not admitting into evidence [the] minutes of a Board of Directors' meeting that documented the basis for [Dr. Menkowitz]'s suspension, because those minutes established the truth of the challenged article[?]

4. Whether the trial court committed reversible error by failing to instruct the jury on which statement was at issue, or even identifying which of the three publications in the record was in dispute[?]

5. Whether the trial court committed reversible error by instructing the jury to draw an adverse inference from the absence of certain evidence without any showing by [Dr.

_____

[6] The Newspaper presents a seventh issue that was merely a counterstatement of the issue asserted by Dr. Menkowitz: "Whether the trial court correctly vacated the jury's award of punitive damages where plaintiff failed to prove by clear and convincing evidence that defendants published any defamatory falsehood with actual malice." Newspaper's Brief at 5.

Menkowitz] that [the Newspaper] had a duty to preserve the evidence or that they did not preserve it in bad faith[?]

6. Whether the trial court erred by failing to set aside or remit the compensatory damages award because [Dr. Menkowitz] failed to present evidence establishing the alleged defamatory implication caused any actual injury[?]

The Newspaper's Brief at 4-5.

Because the issues raised by the cross-appeal, if successful, would result in either judgment in the Newspaper's favor or a new trial, and render Dr. Menkowitz's punitive damages issue moot, we begin our analysis there. The Newspaper contends first that Dr. Menkowitz failed to adduce evidence that the defamatory statement was materially false. Additionally, the Newspaper maintains that, with regard to the allegedly defamatory implications assigned to that statement, the court erred as it failed to determine whether the words were reasonably capable of those implications. Since these questions implicate the trial court's denial of judgment n.o.v., the following informs our review:

> There are two bases on which the court can grant judgment n.o.v.:
>
>> [O]ne, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant[,] the law nonetheless requires a verdict in his favor, whereas the second, the court reviews the evidentiary record and concludes that the

evidence was such that a verdict for the movant was beyond peradventure.

**Polett v. Public Communications, Inc.**, 83 A.3d 205, 212 (Pa. Super. 2013) [(*en banc*)].  In an appeal from the trial court's decision to deny judgment n.o.v.,

we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner.  Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical.  We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case.  Further, the standard of review for an appellate court is the same as that for a trial court.

**Id**. at 211.

**Drake Mfg. Co., Inc. v. Polyflow, Inc.**, 109 A.3d 250, 258-59 (Pa. Super. 2015).

Dr. Menkowitz is a private figure, the Newspaper is a media defendant, and the issue is one of public concern.  **See Dougherty v. The Boyertown Times**, 547 A.2d 778 (Pa. Super. 1988) (speech concerning character of chiropractor was matter of public concern); **see also ToDay's Housing v. Times Shamrock Communications, Inc.**, 21 A.3d 1209, 1213 (Pa. Super. 2011) (activities of highly regulated industry like the housing industry are matters of public concern).  In such cases, the United States Supreme Court has identified two competing societal interests: the "need to avoid self-censorship by the media" and the "legitimate state interest underlying the law

of libel [in] the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch*, 418 U.S. 323, 341 (1974); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 456 (1976).

In a case involving similar parties, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986), the United States Supreme Court ruled unconstitutional Pennsylvania's common law presumption that defamatory speech is false. It held further that, when a newspaper publishes speech of public concern about a private-figure plaintiff, the "private-figure plaintiff must bear the burden of showing that the speech at issue is **false** before recovering damages for defamation from a media defendant." *Id*. (emphasis added); *see also Krajewski v. Gusoff*, 53 A.3d 793, 803 (Pa. Super. 2012) (reinforcing that statements on matters of public concern by the media must be provable as false before there can be liability); *ToDay's Housing*, *supra*.[7]

---

[7] In addition, the Pennsylvania defamation statute, the Uniform Single Publication Act, 42 Pa.C.S.A. § 8343(a), provides that the burden is on the plaintiff to prove:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

Section 8343(b)(1) of the Uniform Single Publication Act, 42 Pa.C.S.A. § 8343(b)(1), also provides that a defendant may avoid liability for defamation if it shows "[t]he truth of the defamatory communication." *See also Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982) ("The proof of truth must go to the gist or sting of the defamation."). In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991), the United States Supreme Court held that substantial truth "would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.'" *Id*. at 516-17. The *Masson* Court explained, "the law does not require perfect truth." *Id*.; *see also ToDay's Housing*, *supra* at 1215 ("The law does not require perfect truth."). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id*. The Court added that "[t]he essence of that inquiry . . . remains the same whether the burden rests upon plaintiff or defendant." *Id*. A "statement is not considered false unless it 'would have a different effect on

---

(5)  The understanding by the recipient of it as intended to be applied to the plaintiff.

(6)  Special harm resulting to the plaintiff from its publication.

(7)  Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343.

the mind of the reader from that which the pleaded truth would have produced.'" *Id*. (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

Furthermore, as this Court held in *Krajewski*, *supra*, even "a statement of opinion relating to matters of public concern that does not contain a provably false connotation will receive full constitutional protection." *Id*. (citing *Hepps*, *supra*). "[W]hether a particular statement or writing constitutes fact or opinion is a question of law for the court to determine in the first instance." *Elia v. Erie Ins. Exchange*, 634 A.2d 657, 660 (Pa. Super. 1993). Opinion is actionable only if it "implies the existence of [false] undisclosed facts." *Dougherty*, *supra* at 785.

In addition to proving falsity, the plaintiff must prove fault in publishing the communication. The *Gertz* Court concluded that private-figure plaintiffs could recover compensatory damages against media defendants by proving something less than actual malice. *Gertz*, *supra* at 348. So long as a state law does not impose liability without fault, "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id*. at 347. In Pennsylvania, that fault need not rise to the level of malice; negligence in the publication will suffice. Specifically, in order to prove negligence, a plaintiff must demonstrate publication with "want of reasonable care and diligence to

ascertain the truth." ***Am. Future Sys., Inc. v. Better Bus. Bureau***, 923 A.2d 389, 400 (Pa. 2007).

Finally, the private-figure plaintiff suing a media defendant for defamation must prove actual damage to reputation causally linked to the false defamatory communication to recover compensatory damages. ***Joseph v. The Scranton Times***, ***L.P.***, 129 A.3d 404 (Pa. 2015). Thus, in order to recover under Pennsylvania law, a private-figure plaintiff must prove falsity, at a minimum negligence in the publication, and actual damage to reputation flowing from the defamatory communication. Damages will be presumed without proof of harm to reputation only if actual malice is shown. ***See Gertz***, 418 U.S. at 349 (even a private-figure plaintiff is required to show actual malice in order to recover either punitive damages or presumed compensatory damages, *i.e.*, compensatory damages without proof of harm to reputation); ***accord Hepps***, 475 U.S. at 773-774. Malice "can be proven by demonstrating that the defendant subjectively acted with reckless disregard for the truth [by entertaining] serious doubts as to the truth of his publication." ***Castellani v. Scranton Times, L.P.***, 124 A.3d 1229, 1234 (Pa. 2015) (quotation marks omitted) (quoting ***Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899, 903 (Pa. 2007)).

Preliminarily, we note the following. Although Dr. Menkowitz initially identified both the statement in the April 18, 1997 article and the "Cheers and Jeers" editorial as defamatory, he focused on the April 18th article at trial, and

particularly, one sentence: "Dr. Menkowitz's sudden absence from the hospital has spawned rampant rumors of professional misconduct regarding his treatment of an older female patient . . .." Secondly, those same defamatory words were the basis of Dr. Menkowitz's defamation by implication claim. Although an action for defamation by implication lies only when **non-defamatory**, *i.e.*, innocent words, become contextually defamatory, the propriety of permitting the plaintiff to proceed on both theories was not challenged below. Hence, that issue is not before us.[8] Third, the verdict slip

_____

[8] Herein, the phrase "Dr. Menkowitz's sudden absence from the hospital has spawned rampant rumors of professional misconduct regarding his treatment of an older female patient[,]" was explicitly libelous on its face and actionable *per se*. Dr. Menkowitz also proffered several defamatory implications from those same words. In ***ToDay's Housing v. Times Shamrock Communications, Inc.***, 21 A.3d 1209 (Pa. Super. 2011), the plaintiff pled both defamation *per se* and defamation by implication. However, unlike the situation herein, the defamatory implications were not derived from the defamatory *per se* statements but from innocent words in the article that were not materially false. Therein, a modular housing retail company sued for defamation after the local newspaper published a series of five articles reporting homeowner complaints about the company's failure to respond to and repair deficiencies. The company alleged that its reputation was harmed because the articles explicitly impugned its customer service. It argued, in the alternative, that the articles falsely implied that it designed and manufactured the defective modular homes. The trial court granted summary judgment in favor of the newspaper. On appeal, this Court held the company did not prove the falsity of the newspaper's account of customer complaints. We found that the evidence in the record was not "even remotely capable of supporting a finding that the pertinent articles were false." ***Id***. at 1214.

In the alternative, the company argued that the articles as a whole, while not materially false, falsely implied that it manufactured the defective modular homes. We concluded that the articles could not reasonably be construed as

made no distinction between the *per se* defamatory statement and the allegedly defamatory innuendos. Thus, we are unable to discern whether the jury believed the defamatory statement in the April 18, 1997 article was facially false, the implications were false, or both. The jury was simply asked:

1. Did Defendants negligently publish a defamatory communication about Elliot Menkowitz, M.D.?

2. Was the defamatory communication false either because it contained untrue or incomplete statement of fact or because its implication was untrue?

N.T. Jury Trial Vol. V, 3/20/14, at 151-52. It is against this backdrop that we apply the applicable legal principles to the facts herein.

The April 18, 1997 article reported that Dr. Menkowitz's staff privileges at PMMC had been suspended and that "his sudden absence from the hospital had spawned rampant rumors of professional misconduct regarding his treatment of an older, female patient." Dr. Menkowitz pled that this statement was defamatory *per se* and false.

A communication is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." ***Elia***, ***supra*** at 704. "A communication is also defamatory if it ascribes to another conduct, character

_____

imparting such an implication. One of the articles identified the manufacturers of the modular homes and another specifically stated that ToDay's Housing did not build the homes, but was responsible for the manufacturer's warranty. The claim for defamation by innuendo failed as a matter of law.

or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. 1995); Restatement (Second) of Torts, § 573 (1977); *see also Mengel v. Reading Eagle Co.*, 88 A. 660, 661 (Pa. 1913) ("Written or printed words injurious to one in his business, calling, trade or profession are libelous"). Since the published statement was of the type that would tend to adversely affect Dr. Menkowitz's fitness for his profession, we agree that it was defamatory *per se*.

However, not all defamatory publications subject the publisher to liability. Where, as here, an issue of public interest is involved, even a private-figure plaintiff must prove that the statements were false, negligently or maliciously published, and, absent proof of actual malice, that the false defamatory communications caused damage to his reputation. *Joseph*, *supra*. The Newspaper contends that, in order to recover even compensatory damages, Dr. Menkowitz was required to show that the statement was materially false, *i.e.*, that it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Air Wis. Airlines Corp. v. Hoeper*, 134 S.Ct. 852, 861 (2014) (citation omitted).

Dr. Menkowitz conceded the truth of the Newspaper's representation that his staff privileges at PMMC were suspended. He maintained, however, that the statement that his "sudden absence from the hospital has spawned rampant rumors" was defamatory and false. Dr. Menkowitz denied that there

were rumors; his wife said she did not personally hear any rumors.  Dr. Menkowitz's journalism expert, Thomas Eveslage, Ph.D, opined that, "rampant rumors of professional misconduct is a false statement" because "I did not see any evidence that it was true."  N.T. Jury Vol. III, 3/18/14, at 423.  Dr. Eveslage thus testified in derogation of the constitutional requirement that a plaintiff, rather than the media defendant, has the burden to prove the falsity of a statement.

We find first that the report of "rampant rumors" did not carry the gist of the libelous charge and was not actionable as defamation as a matter of law.  The substance of the alleged rumors was the proper focus of the alleged defamation.  Moreover, even if the "rampant rumors" language could be viewed as libelous, the record substantiates the truth of that representation. Dr. Pawlowski, one of the physicians interviewed by Mr. Engquist regarding Dr. Menkowitz's suspension, was quoted in the news article as stating that, although he was unaware of the reasons for the suspension, "You hear rumors."  Pottstown Mercury Article, April 18, 1997.  Dr. Menkowitz offered no evidence that the Newspaper falsified or fabricated Dr. Pawlowski's statement.  Dr. Menkowitz's own witness, Attorney Jeffrey Krawitz, testified that there were "rumors flying all over" about Dr. Menkowitz's suspension. N.T. Jury Trial Vol. I, 3/14/14, at 47.  Mr. Engquist's confidential source reported such rumors, and Mr. Engquist verified that members of the public telephoned the Newspaper positing why Dr. Menkowitz was suspended.

Hence, even if the "rampant rumors" statement had been actionable, Dr. Menkowitz did not establish that it was false.

Dr. Menkowitz also pled that the statement that his suspension involved "professional misconduct regarding his treatment of an older, female patient" was false. These words were the essence of his defamation claim, and under **Hepps**, **supra**, it was Dr. Menkowitz's burden to prove the falsity of that statement.[9] However, Dr. Menkowitz testified that he had "no knowledge" why he was suspended or whether his suspension was related to an incident involving a 79-year-old female patient A.D.[10] in the Transitional Care Unit ("TCU") on March 16, 1997. **See** N.T. Jury Trial Vol. III, 3/17/14, at 162. Although he confirmed he visited A.D. in the TCU on that date, N.T. Jury Trial Vol. I, 3/14/14, at 68, he had "absolutely no recollection" of the interaction between him and the female patient. N.T. Jury Trial Vol. II, 3/17/14, at 268, 276. As the Newspaper correctly points out, a lack of recollection or knowledge does not constitute evidence of falsity. **ToDay's Housing**, **supra** at 1214.

---

[9] Dr. Menkowitz also testified that he had no knowledge of the truth or falsity of representations that there were three lawsuits pending against him, two of which were wrongful death actions, or whether the Commonwealth had taken any action against his license. N.T. Jury Trial Vol II, 3/17/14, at 165-168. Furthermore, he offered no proof that the representation was false.

[10] Although the patients were identified in the certified record, we use initials to protect their privacy.

Dr. Menkowitz argues on appeal that he was suspended because of PMMC's determination that his disruptive behavior and verbal harassment of co-workers continued in violation of the ground rules set forth in a 1996 caution letter rather than any misconduct in his professional treatment of an older, female patient. In support thereof, he points to the May 25, 1997 letter advising him that he was suspended for six months because his conduct "poses an immediate threat to the health and welfare of patients." N.T. Jury Trial Vol. III, 3/18/14, at 531. The letter recounted the issuance of the 1996 warning letter and alluded generally to his continued disruptive and unacceptable conduct. Dr. Menkowitz argued that the Newspaper's account that he was suspended due to professional misconduct involving a female patient was false because the suspension letter did not specifically mention such an incident as the basis for the action.

The caution and suspension letters simply did not refute the Newspaper's account. Furthermore, the Newspaper introduced substantial evidence that the statement was true. Dr. Buckley confirmed that staff reported that Dr. Menkowitz verbally intimidated a patient in the TCU. N.T. Jury Trial Vol. II, 3/17/14, at 134. Clayton W. Chang, M.D., who was the Medical Director of the TCU in 1997, testified regarding an incident in that unit involving Dr. Menkowitz on March 16, 1997, just days before the suspension. Dr. Chang was conducting his rounds when Registered Nurse Kathy Koresko approached him. After a conversation with her, Dr. Chang sought out and

spoke to two patients in the TCU, one a female, and the other a male. He described the woman as "upset, agitated, confused, and close to tears." N.T. Jury Trial Vol. IV, 3/19/14, at 694. The man "was confused, agitated, he was angry." *Id*. at 696. Dr. Chang met with each of the patients and prepared an incident report addressed to his superior. He was subsequently directed to obtain a statement from Dr. Menkowitz regarding the incident, but Dr. Menkowitz refused to sign anything. Even Dr. Menkowitz's journalism expert, Mr. Eveslage, conceded that the April 18, 1997 article was factually true. N.T. Jury Trial Vol III, 3/18/14, at 580-81; 591-92. Dr. Menkowitz did not meet his burden of proving the falsity of the defamatory statement under **Hepps** and **Dougherty** and thus, there can be no liability premised on a defamation *per se* theory as a matter of law.

However, in addition to arguing that the statement in the article that Dr. Menkowitz's suspension was prompted by "professional misconduct involving the treatment of an older, female patient" was defamatory *per se* and false, Dr. Menkowitz argued that those same words were capable of defamatory implications that were also false. We agree.

Defamation by implication is an acknowledgement that, in some instances, innocent words, *i.e.*, words not defamatory on their face, may create a defamatory innuendo due to the context in which the statements are issued. Innuendo is the insinuation or implication that arises from the literal language used in a statement or set of comments. Such words are actionable

as defamation where the innuendo is both defamatory and false. **See**

**Dunlap**, **supra** at 15 (recognizing that "the literal accuracy of separate

statements will not render a communication 'true' where . . . the implication

of the communication as a whole was false."). Even where innocent words

are literally true, if, when viewed *in toto*, they create a false implication, the

speaker may be liable for creating a defamatory implication.

The Newspaper contends that the trial court applied the wrong legal

standard when it submitted the defamation by implication claim to the jury.

It argues that the trial court incorrectly viewed the issue as one of sufficiency

of the evidence and found that the statement could be interpreted as

defamatory based upon the testimony of Dr. Menkowitz, his wife and son, and

Attorney Krawitz. The proper question, according to the Newspaper, was

whether the various innuendos were reasonable and justified from the

language used, an inquiry that the Newspaper urges us to answer in the

negative.

The legal test to be applied to determine whether a statement is

defamatory by implication is whether the challenged language can "fairly and

reasonably be construed" to imply the defamatory meaning alleged by a

plaintiff. **Sarkees v. Warner-West Corp.**, 37 A.2d 544, 546 (Pa. 1944).

The "innuendo must be warranted, justified and supported by the publication."

**Livingston v. Murray**, 612 A.2d 443, 449 (Pa.Super. 1992) (quoting

**Thomas Merton Center v. Rockwell International Corp**., 442 A.2d 213,

217 (Pa. 1981)). A publication however, cannot be made libelous "by innuendo which puts an unfair and forced construction on the interpretation of the publication." ***Bogash v. Elkins***, 176 A.2d 677, 679 (Pa. 1962) (quoting ***Sarkees***, ***supra*** at 546). In other words, innuendo cannot be "used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." ***Sarkees***, ***supra*** at 546. "If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury." ***Id***.

To determine whether a publication is capable of a defamatory meaning "the court must consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated." ***Green v. Mizner***, 692 A.2d 169, 172 (Pa. Super. 1997) (citations omitted). When considering defamation by implication, we have stated the following:

> The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff. But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear[.] It is the duty of the trial court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury[.]

*Livingston*, 612 A.2d at 449 (first alteration in original) (quoting *Sarkees*, 37 A.2d at 546). "[E]ven where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987) (citing *Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 489 A.2d 1364, 1368 (Pa. Super. 1985)), *appeal denied*, 548 A.2d 256 (Pa. 1988). "[T]he literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false." *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982). (citations omitted). A publisher may be liable

> for the *implications* of what he has said or written, not merely the specific literal statements made. To say, for example, that a man and a woman married, but not to each other, spent a night together in a hotel room, will be interpreted as an assertion of the pair engaged in sexual activities, because the average reader will assume that "they sayeth not a *pater noster there.*"

*Dunlap* 448 A.2d at 15 (citation omitted) (emphasis in original). However,

> The literal "truth" of a publication need not be established, only that the statement is "substantially true." The proof of "truth" must go to the "gist" or "sting" of the defamation. The test is "whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the completed truth would have produced.

*Id.* (citing Sack, *Libel, Slander, and Related Problems,* 50-51, 137-138 (1980)) (footnotes omitted) (emphasis in original).

Dr. Menkowitz, his wife, son, and Attorney Krawitz assigned several libelous innuendos to the defamatory *per se* words "professional misconduct in the treatment of an older, female patient." Mrs. Menkowitz testified that one could believe that Dr. Menkowitz had been accused of sexual misconduct, although she did not state that she believed it. Similarly, the couple's son testified that the words could mean sexual misconduct or medical malpractice, but again, did not testify that he personally believed either implication. Attorney Jeffrey Krawitz testified that he believed Dr. Menkowitz was indicted for sexual misconduct, although he could not link that belief to the language in the article in question.[11]

The operative paragraph in the Newspaper's article upon which the defamation by implication claim is premised reads:

> Dr. Menkowitz's sudden absence from the hospital has spawned rampant rumors of professional misconduct regarding his treatment of an older female patient. Yet hospital spokesperson Deborah L. Bennis has declined numerous requests from The Mercury for comment.

A jury reading this passage as a whole could find that the passage constitutes defamation by implication. The passage speaks about the doctor's "**sudden**

---

[11] Although Attorney Krawitz testified that he read an article discussing Dr. Menkowitz's professional misconduct with respect to his treatment of an elderly female patient, he was unable to link his impression that it was sexual abuse to the article under scrutiny. He vaguely stated that he "obtained or read from multiple publications articles about Dr. Menkowitz." N.T. Jury Trial Vol. III, 3/18/14, at 255.

**absence**" from the hospital that has spawned "**rampant rumors**" of "**professional misconduct**" regarding his treatment of an older "**female**" patient and that the hospital spokesperson remains mute when asked for comment. It cannot be said as a matter of law that the cumulative effect of this passage may not suggest that Dr. Menkowitz engaged in improper sexual or physical conduct with an older female patient. The reference to the doctor's sudden absence suggests some immediate urgency as if to suggest he is fleeing. People sometimes flee when they have done something terribly wrong or have committed a crime. The mention of "rampant rumors" can certainly suggest something salacious in the untold details of this report. Professional misconduct may certainly suggest many types of misbehavior, including physical or sexual, to a layperson, and certainly at least that and more to others in the medical profession. All of this of course is tied to the treatment of a female patient. One may reasonably ask the purpose to be served by referring to gender if nothing sexual is to be inferred. Thus, a jury was entitled to consider whether this passage is defamatory by implication. "[E]ven where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti*, 536 A.2d at 1345 (citations omitted).

Further, the phrase "professional misconduct" could implicate physical contact or criminal activity. The Medical Practice Act of 1985[12] provides that the State Board of Medicine ("State Board") has the authority to discipline a board-regulated practitioner found guilty of immoral or **unprofessional conduct**. Regulations promulgated by the State Board provide, *inter alia*, that **sexual exploitation** by a board-regulated practitioner of a current patient constitutes **unprofessional conduct**. 49 Pa. Code § 16.110(a). "Sexual Exploitation" in turn is defined as "[a]ny sexual behavior that uses trust, knowledge, emotions or influence derived from the professional relationship." 49 Pa. Code § 16.1. "Sexual Behavior" is defined as "[a]ny sexual conduct which is non-diagnostic and non-therapeutic." ***Id.***

This is not an instance wherein a plaintiff is attempting to use innuendo to introduce new matter, or to enlarge the natural meaning of words to sustain his claim for defamation by implication. ***See Sarkees***, 37 A.2d at 546. Instead, the implications that may be deemed defamatory are derived from the meanings ascribed to the language used and the manner in which the language is used when looking at the statement as a whole. ***See Dunlap***, 448 A.2d at 14-15. The passage specifically refers to Dr. Menkowitz's professional misconduct with regard to his treatment of an older female patient. The suggestion of sexual or physical misconduct may be inferred

---

[12] Act of December 20, 1985, P.L. 457, 63 P.S. §422.1, *et seq.*

from the allegation of professional misconduct. This innuendo does not enlarge the natural meaning of these terms. Rather, the innuendo may be derived from the ordinary meaning of the language used. Thus, we conclude the language used by the Newspaper could fairly and reasonably be construed by implication in a defamatory manner. Therefore, the trial court did not err when it submitted the case to the jury on a defamation by implication theory and denied the Newspaper's motion for judgment n.o.v.[13]

Our conclusion that the challenged statements were capable of defamation by implication also is supported by and aligns with other cases. In **Dunlap v. Philadelphia Newspapers, Inc.**, 448 A.2d 6 (Pa. Super. 1982), the Philadelphia Inquirer ran a front page article with a large banner entitled "Wide Police Corruption Revealed" and two smaller headlines side-by-side stating "Patrol Outside, Gambling Inside" and "Hidden Cameras Confirm Reports of Payoff System." **Id.** at 8. Under the first of the two smaller

_____

[13] In his brief, Dr. Menkowitz claims that he was not required to prove material falsity in a defamation by implication claim. This claim fails. In **Dunlap v. Philadelphia Newspapers, Inc.**, 448 A.2d 6, 14 (Pa. Super. 1982), we held that it was the plaintiff's burden to prove the falsity of the article claimed to be defamatory by implication. We further held "that the literal accuracy of separate statements will not render a communication 'true' where … the implication of the communication as a whole was false." **Id.** at 15; **see also, Philadelphia Newspaper v. Hepps**, 475 U.S. 767, 776 (1984)(the common law's rule on falsity – that the defendant must bear the burden of proving truth – must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.)

headlines were two large photographs, the larger of which "shows a man placing his hand inside a police car marked '17B.' The caption to this photograph reads 'Sergeant's Car 17B Stops Outside Known Gambling Location.'" *Id.* The article further elaborated by explaining that a "man, who appeared to be in his late 50s or early 60s, walked out into the street, leaned on the driver's side, and reached into the squad car through an open window." *Id.* When the Newspaper called the police station, the paper was told Sgt. Samuel Dunlap occupied the car. *Id.* When asked, Dunlap indicated "more than likely" he was driving the car that day and that he knew the man, otherwise known as the town drunk. *Id.* The question presented was whether those who read it could understand the article as defamatory. This Court answered affirmatively concluding that a reasonable person who read the article could have construed it to mean that Sgt. Dunlap was in car 17B and receiving a bribe or pay off. *Id.* at 10. The paper attempted to defend arguing that "the article reported only the undisputed and true facts." *Id.* at 11 (citation omitted). We concluded that when taken as a whole, the article, headline, and photographs could give rise to a false inference drawn from true facts. *Id.* at 15. We also concluded that "'true facts' that in context imply a falsehood are, in an action for defamation not 'true'" and that "the literal accuracy of separate statements will not render a communication 'true' where, as here, the implication as a whole was false." *Id.* at 448 A.2d 15 (citation omitted). As in *Dunlap*, the literal accuracy of the statements here regarding

Dr. Menkowitz may be true, but the implication that he may have physically or sexually abused an older female patient also may reasonably be suggested by innuendo.

In **Mzamane v. Winfrey**, 693 F. Supp.2d 442 (E.D. Pa. 2010), the district court, applying Pennsylvania law, found that the statements there could be defamatory by implication. The plaintiff brought an action for defamation against Oprah Winfrey "stemming from comments made by [Winfrey] regarding plaintiff's performance as headmistress of" the girls' school open and run by a foundation created by Winfrey in South Africa. **Id.** at 461. Winfrey was alleged to state in a meeting and at a press conference that "any person that caused harm to any [of the students] at the school will no longer be allowed to work at the school." **Id.** at 480. She continued to relate that

> thus far, we have removed all of the dorm parents. I've spoken to [plaintiff] and I said to [plaintiff] that I don't know what she knows because the investigation is continuing. I don't know what she knows, or knew, or didn't know, but that I have lost confidence in her ability to run this school. And therefore, she will not be returning to this school.

**Id.** (some capitalization omitted). The court held that the statements were capable of defamatory meaning, since

> [t]he average listener could interpret Winfrey's statement that she has "lost confidence" in plaintiff's abilities, in conjunction with the preceding statement that "any person that caused harm" to the students would not be returning to [the school], to mean that plaintiff was not being retained due to the fact that she played some role in the "harm" caused to the students.

- 32 -

*Id.* at 481 (some capitalization omitted).

> Winfrey's statement that she is uncertain what plaintiff 'knows, or knew, or didn't know' does not negate the implication that plaintiff was aware of the misconduct by the dorm parents. The implication that plaintiff was aware of abuse by the dorm parents and did not react accordingly is capable of defamatory meaning as it ascribes conduct which would render her unfit for her profession as an educator.

*Id.* (some capitalization omitted). As in ***Winfrey***, the same can be said here where Dr. Menkowitz's name was associated with an article alleging rampant rumors of professional misconduct in his treatment of an older female patient.

In ***Cheney v. Daily News L.P.***, 654 Fed. Appx. 578 (3rd Cir. 2016), the court held that the plaintiff could be defamed by implication, where

> the Daily News published an article on its website entitled "Heated Sex Scandal Surrounds Philadelphia Fire Department: 'It's Bad Stuff.'" The text of the article described a sex scandal within the Philadelphia Fire Department. According to the article, the investigation into the scandal "implicates dozens of city employees, including … firefighters," and it was possible that such employees would be criminally charged.

***Cheney***, 654 Fed. Appx. at 580. "The article consisted of two columns: the left contained pictures, and the right contained the text of the article. In the left column, a reader could toggle between two photographs. The first was the silhouette of an unidentified firefighter outside a burning building[.]" ***Id.*** The second, was a photograph "of Cheney captioned 'Philadelphia firefighter Francis Cheney holds a flag at a 9/11 ceremony in 2006.' The photograph focused on Cheney's arm patch, but his face, though out of focus, is visible." ***Id.*** Cheney had no part in the scandal, but "was flooded with messages from

his colleagues at the Philadelphia Fire Department, family, friends and strangers." *Id.* Cheney sued for defamation, and the question to be resolved by the court was whether the article implicated Cheney as one of the firefighters described in the scandal. In holding that the article was capable of defamation, the court found that the article could suggest to a reasonable person that Cheney was among the firefighters implicated in the scandal, because the article described a scandal in which dozens of firefighters were accused, but only identified Cheney in the caption next to the text of the article. *Id.* Similar to *Cheney*, Dr. Menkowitz was associated with allegations of professional misconduct regarding his treatment of an older female patient. The possible association between the innuendo of sexual or physical misconduct and Dr. Menkowitz cannot be mistaken.

Our determination that the challenged statement may be found to be defamatory by implication however, does not answer completely the issue of whether the Newspaper was entitled to have judgment n.o.v. entered in its favor. It must still be determined whether the record supports an award of either compensatory or punitive damages, as proof of damages is an essential part of establishing Dr. Menkowitz's cause of action for defamation by implication. Our Supreme Court's decision in *Joseph* is most instructive in this regard. The *Joseph* Court reaffirmed that, in a private figure/public concern defamation claim, "proof of actual injury to a private plaintiff's reputation is a prerequisite to the recovery of damages for other actual

injuries, including mental and emotional injuries[,]" unless there is a showing of actual malice. *Joseph*, *supra* at 429. Moreover, there must be proof by a preponderance of the evidence that the plaintiff's **injury to reputation** was caused by the defamatory publication rather than the true statements in the article.

First, we agree with the trial court there was no evidence of actual malice adduced herein that would support an award of punitive damages. Our High Court held in *Joseph* that a private-figure plaintiff in a libel case involving media defendants may only recover punitive damages upon satisfaction of the actual malice test enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Actual malice must be shown by clear and convincing evidence, and "whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Joseph*, *supra* at 436 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990)). A media defendant acts with actual malice if it publishes false statements "with a high degree of awareness . . . of probable falsity," or with "serious doubts as to the truth of his publication." *Joseph*, *supra* at 437. The trial court correctly found that there was no clear and convincing evidence that the Newspaper and Mr. Engquist acted with actual malice. *Hepps*, *supra* at 774.

The following facts were largely uncontroverted. As in *Joseph*, Mr. Engquist relied heavily upon a trusted confidential source that had proven 100 percent reliable in the past. N.T. Jury Trial Vol. IV, 3/19/14, at 737. He

attempted to get confirmation of the reason for the suspension from Debra Bennis, the spokesperson for PMMC, but she would not comment. When Dr. Menkowitz did not return his one-half dozen telephone calls, the reporter went to the physician's office in an effort, albeit unsuccessful, to speak to him. Mr. Engquist obtained a list of all members of the MEC and called every person. Two physicians who had previously served on the MEC agreed to speak to him and he quoted their remarks in the article. Information regarding former and pending lawsuits was verified with reference to court records and conversations with the attorneys involved. Attorney Epstein spoke to Mr. Engquist "off the record" and upon the condition that he did not publish his remarks. There is no evidence that he shared with Mr. Engquist what he believed to be the reason for the suspension, but only that a federal lawsuit would be filed the next day. The record establishes that the very day the federal lawsuit was filed, Mr. Engquist accurately and fairly reported Dr. Menkowitz's allegations against PMMC and the physician's view of the stated reasons for his suspension. Finally, Dr. Menkowitz never sought a retraction or a correction.

Mr. Engquist testified. He professed to have no doubts about the truth of the publication. He characterized the factual statements in the first article appearing April 18, 1997, as true. He chose the term "professional misconduct" to connote that the incident occurred in the context of Dr.

Menkowitz's duties as a doctor. The reporter believed that was a fair choice of words to describe Dr. Menkowitz's conduct, and we agree.

Although Professor Eveslage criticized the ethics of a journalist relying solely on confidential sources, such a deviation from journalistic standards was held not to constitute actual malice in ***Harte-Hanks Communications, Inc. v. Connaughton***, 491 U.S. 657, 666-92 (1989); ***see also Blackwell v. Eskin***, 916 A.2d 1123 (Pa.Super. 2007) (holding reliance upon one confidential source without independent confirmation is not malice). Herein, the Newspaper conducted an investigation, but even the failure to do so does not support a finding of malice. ***Harte-Hanks Communications***, ***supra***. A showing of malice requires "more than consideration of whether a reasonable person would have published the statement without further investigation; rather, it requires the plaintiff to present evidence sufficient 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" ***Castellani***, ***supra*** at 1241 (quoting ***St. Amant v. Thompson***, 390 U.S. 727, 731 (1968)). A newspaper's decision to proceed to publish the article, even if it did so in order to get the scoop on the story and increase its profits, is not malice. ***Harte-Hanks Communication***, ***supra***.

Herein, the trial court found, and the record supports, that "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands, and hence that it could not constitutionally

sustain a judgment for presumed or punitive damages in favor of [the Newspaper] under the proper rule of law." Trial Court Opinion, 9/19/14, at 59. Hence, the punitive damages award was properly vacated.[14]

The absence of proof of malice also plays a role in Dr. Menkowitz's claim for compensatory damages. In the absence of proof of malice, Dr. Menkowitz was required to prove an injury to reputation caused by the allegedly false statements or innuendos, not the truthful reporting of the suspension, in order to be entitled to compensatory damages. He failed to meet that burden. Not

_____

[14] We note that the trial court did not instruct the jury that actual malice for purposes of punitive damages must be proven by clear and convincing evidence, not by a mere preponderance. The court told the jury:

> If you find that the Defendant or Defendants acted either intentionally or recklessly in publishing the false or defamatory communication, you may presume that the Plaintiff suffered both injury to his reputation and emotional distress, mental anguish, and humiliation that would result from such a communication.

N.T. Jury Trial Vol. V., 3/20/14, at 930. Later, the trial court reviewed the verdict slip and the special interrogatory regarding punitive damages, which asked: "Did Defendants act with knowledge that the published communication was false or with reckless disregard of whether it was false or not?" *Id*. at 947. The court explained, "Again, for this particular proposition and question, you evaluate the evidence, and you weigh the evidence and how the scales relate to each other." *Id*. This was a reference to its previous example of the scales and the Plaintiff's "burden of tipping the scale ever so slightly in Plaintiff's favor. If it is tipped ever so slightly in Plaintiff's favor, then you must vote for the Plaintiff on that question." *Id*. at 943-944.

Although this instruction was erroneous, the Newspaper did not challenge it below and the issue is not before us on appeal.

one witness testified that his or her view of the physician changed as a result of this communication. Furthermore, even Dr. Menkowitz conceded that the harshness of suspension alone after twenty-five years would lead one to believe that he had done something horrible. N.T. Jury Trial Vol. II, 3/17/14, at 260. He recounted a conversation with an elderly gentleman who recognized his name "because he remembered I was the doctor who was 'kicked out of the hospital.'" *Id*. at 262. Dr. Menkowitz's expert also acknowledged that the public disclosure of the suspension alone was damaging to the physician's reputation. Mr. Eveslage conceded, "If I am reading that a surgeon in a hospital in my town has been banned from seeing patients at the hospital, that clearly is going to be damaging to his reputation." N.T. Jury Trial, Vol. III, 3/18/14, at 440.

Dr. Menkowitz's testimony that other hospitals with which he was associated read the article and stopped using him is similarly deficient as it failed to distinguish whether the alleged injury to reputation was caused by the suspension or the article.[15] Absent is the causal connection required by **Joseph** between the alleged defamatory innuendos and the harm to

---

[15] The Newspaper pled that Suburban General Hospital threatened to suspend Dr. Menkowitz's privileges at that facility in a letter dated two days before publication of the April 18, 1997 article due to PMMC's dissemination of the news of his suspension. Defendants' Answer and New Matter at ¶42. Dr. Menkowitz admitted the truth of that allegation. Plaintiff's Answer to Defendants' New Matter at ¶42. That admission was not placed before the jury.

reputation, as distinguished from the suspension itself. All of the foregoing proof tends to confirm that any damage to Dr. Menkowitz's reputation flowed from the **suspension** itself, not any implication of sexual or physical abuse. Thus, even if we were to find a basis for liability, the record contained insufficient proof that the defamatory statement or innuendos, rather than the fact of suspension, caused damage to reputation that would have supported a compensatory damage award. Dr. Menkowitz's failure to prove damages to his reputation resulting from the defamatory innuendo is fatal to his claim. The Newspaper accordingly, was entitled to have judgment n.o.v. entered in its favor on this claim.

For the above reasons, we vacate the judgment in favor of Dr. Menkowitz, thus affirming the trial court's decision to vacate his punitive damages award, and remand for entry of judgment in favor of Peerless Publications Inc. and Eric Engquist.[16] Jurisdiction relinquished.

President Judge Emeritus Bender, Judge Panella, Judge Lazarus, and Judge Ransom join this opinion.

Judge Bowes files a concurring opinion in which Judge Ott, Judge Dubow, and Judge Moulton join.

---

[16] In light of our conclusion that Dr. Menkowitz failed to sustain his burden of proving damages and thus, his defamation claim, we need not consider the Newspaper's remaining issues presented for appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/17</u>