**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| ELLIOT MENKOWITZ, M.D., | : | No. 40 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of the Superior |
| | : | Court at Nos. 2048 & 2096 EDA 2014 |
| | : | dated December 15, 2017 Vacating |
| v. | : | the Judgment Entered July 23, 2014 |
| | : | in Montgomery County Court of |
| | : | Common Pleas, Civil Division, at No. |
| PEERLESS PUBLICATIONS, INC. AND | : | 1998-07291 and remanding |
| ERIC ENGQUIST, | : | |
| | : | ARGUED: March 6, 2019 |
| Appellees | : | |


**OPINION**


**JUSTICE DONOHUE**                                    **DECIDED: July 17, 2019**

A jury awarded Appellant, Elliot Menkowitz, M.D. ("Dr. Menkowitz"), $1,000,000 in compensatory damages in his defamation suit against Appellees, Peerless Publications, Inc. ("Peerless") and Eric Engquist ("Engquist"). The Superior Court found that the trial court erred in failing to enter judgment *non obstante verdicto* ("JNOV") in Appellees' favor and vacated the award of compensatory damages. We granted allocatur to consider whether in so doing, the Superior Court failed to exercise appropriate deference to the fact-finder when reviewing a JNOV ruling, as explained in this Court's ruling in *Joseph v. Scranton Times, L.P.*, 129 A.3d 404 (Pa. 2015) ("*Joseph III*"). For the reasons set forth herein, we vacate the order of the Superior Court and remand the case to that court for further proceedings.

Dr. Menkowitz began his employment as an orthopedic surgeon at Pottstown Memorial Medical Center ("PMMC") in the early 1970s. At PMMC, Dr. Menkowitz was accused of verbally abusing colleagues and staff and engaging in other inappropriate behavior in front of patients. In April 1996, Dr. Menkowitz was informed that due to his inappropriate conduct, PMMC's Medical Executive Committee and the Medical Committee of the Board had voted to suspend him or allow him to take a voluntary leave to address his behavioral problems. Dr. Menkowitz then disclosed that he had recently been diagnosed with ADHD and suggested that he might be protected under the Americans with Disabilities Act.[1] In light of this information, PMMC did not suspend Dr. Menkowitz or require him to take a leave of absence, but issued a written warning explaining that should Dr. Menkowitz's misbehavior continue, PMMC would summarily suspend all of his clinical privileges. Less than a year later, on March 25, 1997, based upon continuing behavioral issues, PMMC suspended Dr. Menkowitz for six months. The suspension did not last for the full six months, however, as PMMC lifted it approximately one month later when Dr. Menkowitz filed suit against PMMC in federal court for violation of the Americans with Disabilities Act and section 504 of the Rehabilitation Act.[2]

On April 18, 1997, the Mercury, a local Pottstown newspaper, ran a front-page article about Dr. Menkowitz (hereinafter "the Article"). The Mercury is published by Peerless and the Article was written by Engquist. Under the headline "PMMC Suspends Physician," the Article reported that Dr. Menkowitz had been suspended from PMMC. Of particular relevance to this appeal, the Article further stated, that "[Dr. Menkowitz's]

---

[1]  42 U.S.C. §§ 12101-12213.

[2] 29 U.S.C. § 794.

sudden absence from the hospital has spawned rampant rumors of professional misconduct regarding his treatment of an older female patient." This statement (hereinafter, "the Statement") forms the heart of this litigation. On April 26, 1997, the Mercury ran an editorial feature called "Cheers and Jeers," which mentioned Dr. Menkowitz's clash with PMMC and "jeered" the manner in which the parties handled the incident, noting the suspension, the federal civil action filed by Dr. Menkowitz, and PMMC's subsequent decision to lift the suspension.[3]

Upon opening his newspaper on April 18, 1997, Dr. Menkowitz discovered the Article. He quickly fell into a severe depression. Dr. Menkowitz's treatment for this depression included multiple medications that caused fasciculations (tremors) in his arms and hands, impairing Dr. Menkowitz's ability to perform surgery.

In April 1998, Dr. Menkowitz filed the underlying action in Montgomery County, raising claims of defamation, invasion of privacy - false light, intentional interference with existing and prospective relationships, and intentional infliction of emotional distress related to these publications.[4] In particular, Dr. Menkowitz alleged that the Statement, which referenced misconduct in connection with an elderly female patient, gave rise to

---

[3] The Mercury published two other articles related to Dr. Menkowitz's suspension and his federal lawsuit, neither of which are relevant to the present litigation. These articles were published on April 19 and 23, 1997. The April 19 article reported on the suit Dr. Menkowitz filed against PMMC alleging various federal and state civil rights violations and that his suspension violated the Americans with Disabilities Act. The April 23 article reported that PMMC had lifted the suspension, but indicated that the terms of the settlement that led to the lifting of the suspension were confidential.

[4] Presently, we are concerned only with Dr. Menkowitz's defamation claim related to the Article containing the Statement, published on April 18, 1997. Although Dr. Menkowitz also alleged defamation in his complaint related to the April 26 editorial, he did not pursue this claim at trial.

defamatory implications or innuendo.  Complaint, 4/14/1998, ¶ 19.  Dr. Menkowitz sought

punitive damages, which required him to prove that Appellees acted with malice in

publishing the Article.  *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).[5]  Dr.

Menkowitz also sought compensatory damages for his mental and emotional pain.  To be

entitled to compensatory damages, Dr. Menkowitz did not have to prove malice, but did

have to prove that the alleged defamatory innuendo was published negligently and that

Dr. Menkowitz suffered reputational injury therefrom.[6]  *See Joseph*, 129 A.3d at 428-29;

*American Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*, 923 A.2d 389, 400

(Pa. 2007).

Trial did not commence until 2014.  In an attempt to prove malice in connection

with his claim for punitive damages, Dr. Menkowitz presented testimony from an expert

---

[5]  Malice in the context of defamation requires a showing that "the defendant must have made the false publication with a 'high degree of awareness ... of probable falsity,' or must have 'entertained serious doubts as to the truth of his publication.'"  *Joseph III*, 129 A.3d at 437 (quoting *Harte-Hanks Comm. Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989)).

[6]  Pursuant to Pennsylvania statute, in an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1)  The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343(a).

witness to establish that Appellees published the Article with a high awareness of its probable falsity or serious doubts as to its truthfulness. Appellees defended against this accusation with testimony from Engquist regarding his sources for the Article and his belief as to the truth of its representations. Appellees also called an expert witness, who opined that publication of the Article did not violate journalistic standards.

With regard to compensatory damages, Dr. Menkowitz testified to the depression he suffered following the publication of the Article and the physical consequences of the medicines used to alleviate the depression. He also testified that after publication of the Article, additional hospitals terminated his privileges and attorneys ceased using him as an expert witness. Dr. Menkowitz's wife and son testified regarding the effect that reading the Article had on him. Dr. Menkowitz's treating psychologist, who testified as to the depth and severity of Dr. Menkowitz's depression, opined that it was triggered by the publication of the Article. Dr. Menkowitz also presented the testimony of a practicing attorney, Jeffrey A. Krawitz, Esquire ("Attorney Krawitz"), who indicated that he had written a letter to opposing counsel who was planning to use Dr. Menkowitz as an expert in a particular case. In this letter, Attorney Krawitz informed opposing counsel that he had learned that Dr. Menkowitz had been indicted on charges relating to improper sexual conduct with patients.

The jury returned a verdict in Dr. Menkowitz's favor, awarding both compensatory and punitive damages. In compensatory damages, the jury awarded $200,000 for harm to reputation and $800,000 for past wage loss and future earning capacity. Appellees filed post-trial motions, seeking, among other relief, JNOV, and a remittitur or vacation of the punitive damage award. After entertaining argument, the trial court vacated the

punitive damage award, concluding that Dr. Menkowitz had failed to establish that Appellees acted with malice. The trial court denied all other relief, including Appellees' request for entry of JNOV.

Both parties appealed. Appellees raised eight issues of trial court error, asserting claims that the trial court erred in denying their post-trial request for JNOV; denying their post-trial request for remittitur of the compensatory damage award; failing to issue particular jury instructions; and making certain evidentiary rulings. *See* Trial Court Opinion, 9/19/2014, at 5-6. Dr. Menkowitz challenged only the trial court's decision to vacate the punitive damage award. *Id.* at 5. The trial court issued a lengthy opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. With regard to Appellees' challenge to the denial of their motion for JNOV, the trial court rejected Appellees' contention that Dr. Menkowitz had failed to prove that the Article contained a material falsity. The trial court noted that the Superior Court has recognized the tort of defamation by implication, pursuant to which the "literal accuracy of separate statements will not render a communication 'true' where … the implication of the communication as a whole was false." *Id.* at 13 (quoting *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982)). Reviewing the testimony of Dr. Menkowitz, his son, his wife and Attorney Krawitz, each of whom indicated that the Statement's reference to "professional misconduct" in connection with an "older female patient" implied that Dr. Menkowitz was guilty of sexual improprieties, the trial court concluded that the jury had sufficient evidence to conclude that the Statement was defamatory by implication, and thus it was not error to submit the issue of defamatory meaning to the jury for resolution. *Id.* at 14-16.

Next, the trial court supported its decision to vacate the jury's award of punitive damages, concluding that Dr. Menkowitz had failed to produce sufficient evidence that Appellees either knew that the Article was false or had a "high degree of awareness of … probable falsity." *Id.* at 12 (quoting *Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). Finally, based upon the testimony of Dr. Menkowitz, his treating psychologist, and Attorney Krawitz, the trial court determined that Dr. Menkowitz had presented sufficient evidence to support the jury's award of compensatory damages for harm to reputation, past wage loss and impairment of future income, and that as a result JNOV had been properly denied. *Id.* at 27-29.

On appeal, the Superior Court acknowledged that in cases such as this, with a private figure as plaintiff, a media defendant, and an issue of public concern, the plaintiff must prove falsity of the communication at issue, negligence in its publication, and actual damage to the plaintiff's reputation caused by the defamatory communication for an award of compensatory damages. *Menkowitz v. Peerless Publ'ns, Inc.*, 176 A.3d 968, 978 (Pa. Super. 2017), *appeal granted in part*, 190 A.3d 594 (Pa. 2018). Concerning falsity, the court explained that although Dr. Menkowitz conceded that the component of the Article that reported on his suspension was true, his argument focused on the Statement and alleged that it was capable of defamatory implications or innuendo that were false. *Id.* at 982. The Superior Court recognized that the test to determine whether a statement is capable of defaming a subject by innuendo asks whether the statement can reasonably be construed to imply the defamatory meaning alleged. *Id.* (citing *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944)). The alleged innuendo must be adequately supported by the challenged language and cannot be the product of

a forced construction of the natural meaning of the words. *Id.* The trial court, in the first instance, must assess whether the objected-to language is capable of defamatory implication; if the court determines that the language does not support the alleged innuendo, the case should not be sent to the jury. *Id.* When the language is capable of both innocent and defamatory interpretations, it is for a jury to decide if the recipient understood the defamatory implications. *Id.* (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987)).

The Superior Court found that Dr. Menkowitz adequately established that the Statement is capable of defamation by implication. In reaching this conclusion, the Superior Court parsed the Statement's phrases and discussed their plausible implications at length. *See id.* at 983-87. For instance, it reasoned that a jury could find that the phrase "professional misconduct" suggests an array of misconduct to lay persons, including sexual impropriety. *Id.* at 984. The Superior Court found the inclusion of the patient's gender supportive of the innuendo of sexual impropriety, as there would be no reason to identify the patient as female "if nothing sexual is to be inferred." *Id.* at 984. It further noted that the sexual innuendo from "professional misconduct" is plausible because the State Board of Medicine's regulations provide that sexual behavior with a patient is "unprofessional conduct." *Id.* The Court also focused on the use of the phrase "sudden absence," which, in its view, could reasonably suggest that Dr. Menkowitz had to act with urgency and was fleeing PMMC. *Id.*

The Superior Court then turned its attention to whether Dr. Menkowitz met the threshold requirements to be entitled to either punitive or compensatory damages. It first considered the trial court's conclusion that Dr. Menkowitz failed to establish malice in

connection with the punitive damage award. The Superior Court found that the evidence of record supported the trial court's conclusion, citing to Engquist's testimony and Appellees' expert's opinion that there was no deviation from journalistic standards so as to permit a finding of malice. *Id.* at 988.

Turning to the propriety of the compensatory damage award, the Superior Court considered whether Dr. Menkowitz established that he suffered damage to his reputation attributable to the Statement's defamatory innuendo, as opposed to his suspension from PMMC. It concluded that Dr. Menkowitz had presented no evidence to confirm that the alleged injury to reputation was caused by the contents of the Article as opposed to his suspension. The Superior Court explained that

> [n]ot one witness testified that his or her view of the physician changed as a result of this communication. Furthermore, even [Dr. Menkowitz] conceded that the harshness of suspension alone after twenty-five years would lead one to believe that he had done something horrible. N.T.[], 3/17/[20]14, at 260. He recounted a conversation with an elderly gentleman who recognized his name "because he remembered I was the doctor who was 'kicked out of the hospital.'" *Id.* at 262. [Dr. Menkowitz's] expert also acknowledged that the public disclosure of the suspension alone was damaging to the physician's reputation. Mr. Eveslage conceded, "If I am reading that a surgeon in a hospital in my town has been banned from seeing patients at the hospital, that clearly is going to be damaging to his reputation." N.T.[], 3/18/[20]14, at 440.

> [Dr. Menkowitz's] testimony that other hospitals with which he was associated read the article and stopped using him is similarly deficient as it failed to distinguish whether the alleged injury to reputation was caused by the suspension or the article. Absent is the causal connection required by *Joseph* between the alleged defamatory innuendos and the harm to reputation, as distinguished from the suspension itself. All of the foregoing proof tends to confirm that any damage to [Dr. Menkowitz's] reputation flowed from the suspension itself, not any implication of sexual or physical abuse. Thus, even if we

were to find a basis for liability, the record contained insufficient proof that the defamatory statement or innuendos, rather than the fact of suspension, caused damage to reputation that would have supported a compensatory damage award. [Dr. Menkowitz's] failure to prove damages to his reputation resulting from the defamatory innuendo is fatal to his claim.

*Id.* at 989. The Superior Court vacated the award of compensatory damages and remanded for the entry of JNOV in Appellee's favor without reaching the other issues raised. *Id.*[7]

On appeal to this Court, we granted allocatur with respect to a single issue:

Did the Superior Court disregard this Court's holding in *Joseph III* by failing to apply the appropriate standards of causation and deference in vacating the judgment entered by the trial court awarding substantial compensatory and consequential damages to Elliot Menkowitz, M.D. for harm to reputation and loss of past and future earnings?

*Menkowitz v. Peerless Publ'ns., Inc.*, 190 A.3d 594 (Pa. 2018). With respect to this question, Dr. Menkowitz argues that in *Joseph III*, this Court held that appellate courts must defer to the facts as determined by the factfinder when reviewing defamation claims. Dr. Menkowitz's Brief at 26-29; 32-34. Dr. Menkowitz claims that contrary to this standard, here the Superior Court made its own findings of fact rather than limiting its inquiry to determining whether there was sufficient competent evidence of record to support the jury's determination. *See id.* at 29-32, 35-40. In particular, Dr. Menkowitz criticizes the Superior Court for disregarding specific evidence that supported the jury's award of damages. Dr. Menkowitz argues that the Superior Court was not free to ignore this

---

[7] In a concurring opinion joined by three judges, the Honorable Mary Jane Bowes explained her view that the Statement was not reasonably capable of defamatory innuendo such that the claim should not have been submitted to the jury. *See Menkowitz*, 176 A.3d at 989-90 (Bowes, J., concurring).

evidence, but instead was required to consider and accept it as credible fact when reviewing the trial court's denial of Appellees' motion for JNOV.

Appellees disagree. To the contrary, they argue that the Superior Court performed the proper review, and in so doing found that Dr. Menkowitz offered no evidence (as opposed to incredible evidence) that he suffered reputational harm because of the Statement's alleged false innuendo. Appellees' Brief at 26. Appellees suggest that *Joseph III* is distinguishable on this basis, arguing that while in *Joseph III* this Court found error when the Superior Court ignored or minimized certain evidence to arrive at contrary factual conclusions, in the present case, the Superior Court did not make factual findings but rather merely discerned that the record was entirely devoid of evidence that would support a finding that Dr. Menkowitz suffered reputational harm due to innuendo arising from the Statement. *Id.* at 28.[8]

We review the Superior Court's legal conclusions de novo and our scope of review is plenary. *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1093 (Pa. 2012). An appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law. *See Rost v. Ford Motor Co.*, 151 A.3d 1032, 1042 (Pa. 2016) (citing *Reott*, 55 A.3d at 1093). An abuse of discretion does not result from a mere error of judgment. *See, e.g., Humphreys v. DeRoss*, 790 A.2d 281, 283 (Pa. 2002); *Kelly v. Cty. of Allegheny*, 546 A.2d 608, 610 (Pa. 1988); *Echon v. Pa. R. Co.*, 76 A.2d 175,

---

[8] Pennsylvania NewsMedia Association has filed a brief for amicus curiae in support of Appellees. It advocates for a standard that requires an analysis of each statement and alleged innuendo individually in defamation claims by a private citizens against a media defendant "to strike the proper balance between the competing interests of protecting speech and protecting reputation." *See* Brief for Amicus Curiae at 4-7. It argues that the Superior Court engaged in this type review when it reached it decision and vacated the judgment adverse to Appellees. *Id.* at 8-9.

178 (Pa. 1950); *Mielcuszny v. Rosol*, 176 A. 236, 237 (Pa. 1934). An abuse of discretion exists where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record. *Echon*, 76 A.2d at 178.

A court may enter JNOV on one of two bases. The first is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure v. Raeuchis,* 604 A.2d 1003, 1007 (Pa. 1992). The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.*; *see also Birth Ctr. v. St. Paul Companies, Inc.*, 787 A.2d 376, 383 (Pa. 2001). In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure. *Moure*, 604 A.2d at 1007. In reviewing the lower court's decision, we must read the record in the light most favorable to the verdict winner and afford him the benefit of all reasonable inferences. *Id.*

Thus, in the present case we may conclude that the trial court's denial of JNOV was inappropriate only if there is insufficient, competent evidence to sustain the verdict. *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, 1246 (Pa. 1989). Because Dr. Menkowitz prevailed at trial on his entitlement to compensatory damages, we give him the benefit of every reasonable inference arising from the evidence, while rejecting all unfavorable testimony and inferences. *Justice v. Lombardo*, __ A.3d __, 2019 WL 2324277 (Pa. May 31, 2019). Moreover, JNOV should only be entered in a clear case with any doubts resolved in favor of the verdict winner. An appellate court

"stands on a different plane" than a trial court, and it is the trial court that has the benefit of an "on-the-scene evaluation of the evidence." *Exner v. Gangewere*, 152 A.2d 458, 472-73 (Pa. 1959). As such, while the appellate court may disagree with a verdict, it may not grant a motion for JNOV simply because it would have come to a different conclusion. Indeed, the verdict must stand unless there is no legal basis for it. *Birth Ctr.*, 787 A.2d at 383.

With this background, we turn to *Joseph III*. In 2002, Thomas Joseph, Sr., his son and his two businesses, Acumark, Inc., and Airport Limousine and Taxi Service, Inc., filed suit against a Scranton-area newspaper and two of its journalists, alleging, inter alia, defamation. They based their claims on eight articles, published between June and October 2001, concerning alleged ties between Joseph and organized crime activities, including an association with the purported head of a Northeastern Pennsylvania crime family, William D'Elia. Among other information, the articles reported on the execution of federal and state search warrants at Acumark, Inc., Joseph's home, D'Elia's home, and the homes of two other individuals. The now-former Judge Mark Ciavarella of Luzerne County Court of Common Pleas presided over a bench trial, at the conclusion of which he returned a verdict in Joseph's favor and awarded $2,000,000 in compensatory damages. The Superior Court affirmed. *Joseph v. Scranton Times L.P.*, 959 A.2d 322 (Pa. Super. 2008) ("*Joseph I*"). In response to an application for extraordinary relief filed by the media defendants, however, this Court exercised its King's Bench power to vacate the verdict, judgments, and all substantive orders, due to the appearance of judicial impropriety in the assignment of the case and remanded for the assignment of a new judge and trial. *Joseph III*, 129 A.3d at 410.

The Honorable Joseph Van Jura presided over a second bench trial. While Judge Van Jura found that the articles contained false statements, he concluded that Joseph was not entitled to recover damages because he failed to establish that he suffered any impairment of reputation or standing in the community. *Id.* at 411. The trial court found the testimony of Joseph and his daughter that he had lost friendships and his social life had been impaired to be incredible, as Joseph had made the same claims in relation to injuries that he suffered in a car accident. *Id.* Further, the trial court found that Joseph completely failed to put forth a single member of the community that held a diminished view of him because of allegations that he was connected to organized crime. *Id.* at 434. Because Joseph failed to establish any harm caused by the articles, a verdict was entered for the media defendants. Judge Van Jura's term having expired, the Honorable Lesa S. Gelb denied Joseph's post-trial motion seeking JNOV or a new trial. *Id.* at 415.

The Superior Court reversed, disagreeing with the conclusion that Joseph had failed to establish that he had suffered harm as a result of the articles. Although recognizing that the trial court did not believe Joseph's (or his daughter's) testimony regarding harm to his reputation, the Superior Court explained that the injuries from defamatory statements include not only reputational harm, but also personal humiliation and mental anguish. *Id.* at 417 (discussing *Joseph v. Scranton Times, L.P.*, 89 A.3d 251 (Pa. Super. 2014) ("*Joseph II*"), *appeal granted*, 105 A.3d 655 (Pa. 2014)). In this regard, the Superior Court concluded that it was error to ignore the testimony of Joseph, his son and his daughter-in-law, all of whom, in the Superior Court's view, established that Joseph had suffered emotional distress, mental anguish and personal humiliation because of the articles. *Id.* The Superior Court noted that the trial court had not found this testimony to

be incredible, but had instead ignored it entirely. *Id.* This error, the court concluded, entitled Joseph to a new trial. *Id.* at 420.

In *Joseph III*, this Court reversed. We began by reviewing specific principles imposed by the First Amendment to the United States Constitution[9] that govern the analysis of causation in private figure defamation cases. A state's legitimate interest in compensating private individuals for injury to reputation "extends no further than compensation for actual injury," and that injury must flow from "the publication of a false fact.'" *Joseph III*, 129 A.3d at 426 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)). As such, the First Amendment requires that, in cases where the alleged defamation is published negligently, a private figure must establish through "competent evidence" that the falsehood caused an actual injury. *Id.* at 426 (quoting *Gertz*, 418 U.S. at 350). In accordance therewith, in *Joseph III* we indicated that "it is incumbent upon [private figure] plaintiffs to establish a causal connection between the negligently published falsehood and the actual injuries which they have suffered." *Id.* at 429. To do so, a plaintiff must prove that the negligently published falsehood was both the cause-in-fact and the proximate cause of the injuries: (1) "but for" the negligently published falsehood the plaintiff would not have sustained the injury, and (2) the falsehood was "a substantial factor in bringing about the plaintiff's injury." *Id.* In sum, we held that

---

[9] In *Joseph III*, this Court acknowledged that in light of landmark U.S. Supreme Court defamation decisions, we may not interpret our state's Constitution as providing broader free expression rights than does its counterpart. *Joseph III*, 129 A.3d at 428; *see also Norton v. Glenn*, 860 A.2d 48, 58 (Pa. 2004) {"[T]he protections accorded ... by the U.S. Supreme Court to the right of free expression in defamation actions ... demarcate the outer boundaries of our Commonwealth's free expression provision."); *American Future Sys.,* 923 A.2d at 395 ("[I]n the context of defamation law the state Constitution's free speech guarantees are no more extensive than those of the First Amendment.").

Pennsylvania law requires that a private figure show the falsehood caused an actual injury to his reputation, and that "proof of actual injury to ... reputation is a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries." *Id.* at 429-30. A plaintiff may establish causation "with any evidence, direct or circumstantial, which tends to prove the media defendant's libelous publication caused the alleged actual injury." *Id.* at 429 (citing *Hamil v. Bashline*, 392 A.2d 1280, 1285 (1978)).

Given the requirement of proof of actual injury to reputation, in *Joseph III* we held that the Superior Court had erred in ruling that Joseph could recover for mental and emotional injury without establishing reputational harm. *Id.* at 433. Of particular importance to the issues presented here, this Court also rejected the Superior Court's determination that the trial court had ignored the testimony of Joseph, his son and daughter-in-law. *Id.* We pointed out that, to the contrary, it was within the trial court's discretion, as the factfinder, to reject this testimony, citing the well-established standard that questions of credibility and conflicts in evidence are for trial courts to resolve, not appellate courts. *Id.* (citing *Dept. of Trans., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873, 875 (Pa. 1989)). We admonished the Superior Court for its approach, in which it "scour[ed] the record for evidence which could, arguably, support the finding the articles caused [Joseph] to suffer personal humiliation and anguish, and then … suggest[ed] that the trial court erred in disregarding th[is] evidence" as contrary to the abuse of discretion standard it was bound to apply. *Id.* We indicated that "[w]here, as here, the plaintiffs are private figure plaintiffs, this Court has held that Pennsylvania requires private figures to prove, at a minimum, negligence in a civil libel case." *Id.* at 428 (citing *American Future*

*Sys., Inc.*, 923 A.2d at 400). We concluded by acknowledging that "[t]he fact that the Superior Court would have reached a decision contrary to the trial court based on facts in the record does not constitute an abuse of discretion." *Id.*

In reversing the trial court's refusal to grant JNOV on compensatory damages, the Superior Court framed the issue as whether Dr. Menkowitz proved that the injury to his reputation was caused by the "allegedly false statements or innuendos" in the Statement, as opposed to the "truthful reporting of the suspension" in the Article. *Menkowitz*, 176 A.3d at 989. The Superior Court first indicated that "not one witness testified that his or her view of the physician changed as a result of this communication." *Id.* It noted Dr. Menkowitz's testimony "that other hospitals with which he was associated read the article and stopped using him," but stated that this testimony was "similarly deficient as it failed to distinguish whether the alleged injury to reputation was caused by the suspension or the article." *Id.* Finally, the court cited to instances in the evidentiary record where (1) Dr. Menkowitz and his expert witness indicated that a suspension alone could be damaging to one's reputation, and (2) an elderly man told Dr. Menkowitz that he recognized his name because "he remembered I was the doctor who was kicked out of the hospital." *Id.* In summary, the court held that "[a]ll of the foregoing proof tends to confirm that any damage to Dr. Menkowitz flowed from the **suspension** itself, not any implication of sexual or physical abuse." *Id.* (emphasis in original).

In support of the Superior Court's reasoning, Appellees insist that *Joseph III* has no application because here, unlike in *Joseph III,* the Superior Court did not weigh any

evidence or hold that the causation evidence presented was unpersuasive.[10] Appellees' Brief at 26. Instead, Appellees contend that the Superior Court merely held that Dr. Menkowitz had presented no evidence linking his reputational injuries to the false implications of improprieties in the Statement. *Id.* Unlike *Joseph III*, Appellees argue that this is not a case where the Superior Court "scoured the trial record" to find evidence that supported its preferred outcome. *Id.* at 28.

We disagree with Appellees' contentions, as we conclude that the Superior Court erred when reviewing the trial court's denial of JNOV relief. First, in reversing the trial court's denial of Appellees' motion for JNOV, the Superior Court did not reach a finding that the trial court had abused its discretion or committed an error of law. To the contrary, the intermediate appellate court did not mention the evidence cited by the trial court in its Rule 1925(a) opinion in support of its denial of JNOV. In particular, the Superior Court overlooked the testimony of Dr. Menkowitz's principal causation witness, Attorney Krawitz, who testified that after reading the Article, he wrote a letter to another attorney

---

[10] Appellees attempt to distinguish *Joseph III* on two additional grounds. First, Appellees contend that the two cases involve different types of claims, since *Joseph III* involved claims of direct defamatory statements while this case involves a claim of defamation by implication. Appellees' Brief at 27. We cannot agree with this argument, since both cases raise the same foundational issue as to whether the plaintiff presented sufficient competent evidence to tie the defamatory statements in question to the plaintiff's claims for damages.

Second, Appellees claim that *Joseph III*'s deference requirement attaches only when an appellate court wrongly second-guesses a trial court's finding that the plaintiff failed to support its damage claim with sufficient competent evidence, but does not apply with the same force when the appellate court second-guesses a trial court's finding that the plaintiff did introduce the necessary support for its claim. Appellees' Brief at 28. We do not agree that *Joseph III*'s deference requirement is to be limited in this respect, as an appellate court's standard of review over a trial court's ruling on a request for JNOV is fundamentally the same in all cases.

who was using Dr. Menkowitz as an expert witness and informed him that Dr. Menkowitz had been accused of committing "improper sexual advances on his patients." Trial Court Opinion, 9/19/2014, at 25.

Second, contrary to Appellees' contention, the Superior Court here did in fact "scour the record" to identify evidence that supported its outcome. The trial court made no mention of the testimony of Dr. Menkowitz[11] or his expert witness regarding the potential damage to reputation that may result from a hospital suspension. The trial court also did not include in its ruling any reference to Dr. Menkowitz's recollection of an elderly man who remembered his name because he had been "kicked out of the hospital." As indicated hereinabove, when reviewing a denial of JNOV, the reviewing court should limit its inquiry as to whether there is sufficient competent evidence to support the factfinder's verdict, and in this regard the court must reject all unfavorable testimony and inferences. See Justice, __ A.3d __, 2019 WL 2324277. The Superior Court did not do so, as it instead used contrary evidence as the principal support for its conclusion that "any damage to Dr. Menkowitz flowed from the suspension itself, not any implication of sexual or physical abuse." Menkowitz, 176 A.3d at 989.

Third, and perhaps most importantly, the Superior Court, unlike the trial court, did not give Menkowitz, as the verdict winner, the benefit of every reasonable inference arising from the evidence while resolving any doubts in his favor. Contrary to the Superior Court's contention that "not one witness testified that his or her view of the physician

---

[11] In other testimony, Dr. Menkowitz testified that he suffered no harmful effects (e.g., depression) as a result of the Article's report of his suspension. N.T., 4/15/2014, at 252 ("I was pretty confident that I had good legal counsel, and they were going to resolve the issue, and I would be back doing what I loved to do.").

changed as a result of this communication," *id.*, the trial court specifically identified Attorney Krawitz as one such individual. Based upon its review of the evidentiary record, the trial court determined that Attorney Krawitz "testified that he believed the Article implied Dr. Menkowitz made 'improper sexual advances on his patients.'" Trial Court Opinion, 9/19/2014, at 15. The Superior Court disregarded this testimony on the grounds that Attorney Krawitz was unable to link his impression that Dr. Menkowitz had sexually abused a female patient to the Article. *Menkowitz*, 176 A.3d at 983 n.11 (indicating that Attorney Krawitz "vaguely stated that he 'obtained or read from multiple publications articles about Dr. Menkowitz'"). In its Rule 1925(a) opinion, however, the trial court found precisely to the contrary, quoting the following testimony in the record relating to his belief about Dr. Menkowitz's sexual improprieties:

| Counsel: | Did you read an Article that accused him of professional misconduct with respect to his treatment of an elderly, female patient? |
|---|---|
| Krawitz: | I did. |

Trial Court Opinion, 9/19/2014, at 26 (quoting N.T., 4/15/2014, at 361). Attorney Krawitz further testified that he had read the Article in the Mercury. N.T., 4/15/2014, at 363 ("I saw that Article and I had that Article based upon my research."). Based upon this testimony, the trial court, drawing all inferences in favor of Dr. Menkowitz as the verdict winner, concluded that he had presented sufficient evidence to establish a causal link between the Statement in the Article and Dr. Menkowitz's reputational harm – such that a reasonable juror could have concluded that Attorney Krawitz's reading of the Statement in the Article had damaged Dr. Menkowitz's reputation in Attorney Krawitz's eyes. Trial Court Opinion, 9/19/2014, at 25-26.

Dr. Menkowitz's own testimony also established the necessary causal link between the Statement and the harm to his reputation. Dr. Menkowitz testified as follows:

Menkowitz: Well, you know, as a physician, when someone says something about "professional misconduct," I am thinking I gave you the wrong medication, I operated on the wrong leg; you know, what in the world did I do wrong from a medical standpoint.

\*     \*     \*

All the other Hospitals I was associated with read the article and asked me to resign my appointments. Lawyers that used me to evaluate patients stopped using me and most importantly patients stopped coming to see me. Those who read the article drew negative inferences, and those who only heard the **rumor** drew worse conclusions. The **rumors** spread as far as Hawaii and the incident became sensationalized with negative connotations.

Trial Court Opinion, 9/19/2014, at 26 (quoting N.T., 4/15/2014, at 250, 262) (emphasis added). Dr. Menkowitz's references to "rumors" in this testimony permits a reasonable inference in his favor that the alleged damage to his reputation was the result not of the Article's report of his suspension, but rather more specifically to the Statement, as the Statement referenced "rampant **rumors** of professional misconduct regarding his treatment of an older female patient." *Menkowitz*, 176 A.3d at 973 (emphasis added). In addition, Dr. Menkowitz testified that he stopped receiving patient referrals and lost privileges at other hospitals not at the time of his suspension, but only after publication of the Article containing the Statement. N.T., 4/15/2014, at 251 (noting that after the suspension, "I continued to be very busy, and I was just taking patients to other facilities to operate on them."). Based upon its review of the trial record, the trial court, again drawing all reasonable inferences in Dr. Menkowitz's favor, concluded that the "evidence

at trial, including [Dr. Menkowitz's] own testimony, provided a sufficient basis for his compensatory damage award based upon harm to his reputation." Trial Court Opinion, 9/19/2014, at 26.

In this case, the Superior Court's standard of review in connection with the trial court's denial of JNOV was to determine whether the trial court had abused its discretion when it determined that sufficient, competent evidence existed in the trial record to sustain the jury's verdict. For the reasons set forth herein, we conclude that the Superior Court failed to do so.[12] Instead, the Superior Court cited to other evidence that could support a contrary conclusion and, in so doing, did not review the record in the light most favorable to the verdict winner and afford him the benefit of all reasonable inferences. As a result, the Superior Court disregarded this Court's holding in *Joseph III* by failing to apply the appropriate standards of causation and deference.

Accordingly, we reverse the Superior Court's order in the present case granting JNOV in favor of Appellees. Because the intermediate appellate court did not rule on the other issues the parties raised before it, we remand to that court for further proceedings.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.

---

[12] In their brief filed with this Court, Appellees raise two additional issues: (1) because the First Amendment requires that a private figure establish that his/her injury was caused by a false statement, a trial court's denial of JNOV should be subject to an independent appellate review (rather than an abuse of discretion analysis); and (2) the Superior Court erred in its determination that the Statement was capable of defamatory implication. This Court did not grant allocatur to consider these issues, however, and thus they are beyond the scope of our present review.